UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

| | |
|---|---|
| A.M., an individual,<br><br>Plaintiff,<br><br>v.<br><br>OMEGLE.COM LLC,<br><br>Defendant. | Case No. 3:21-cv-01674-MO |

**MOTION BY THE PUBLIC HEALTH ADVOCACY INSTITUTE FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFF'S SECOND AMENDED COMPLAINT**

The Public Health Advocacy Institute respectfully moves for leave to submit the attached amicus curiae brief in support of the plaintiffs' second amended complaint.

While there is no rule addressing the filing of an amicus brief in a district court, "a district court has broad discretion in the appointment of amicus curiae.'" *California v. U.S. DOL*, No. 2:13-CV-02069-KJM-DAD, 2014 U.S. Dist. LEXIS 5439, 2014 WL 12691095, at *1 (E.D. Cal. Jan. 14, 2014) (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982), abrogated on other grounds by *Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995)). Indeed, district courts "frequently welcome amicus briefs from non-parties concerning legal issues that have potential ramifications beyond the parties directly involved," *NGV Gaming, Ltd. v. Upstream Point Molate*, L.L.C., 355 F. Supp. 2d 1061, 1067 (N.D. Cal. 2005). The Honorable John V. Acosta provided the following guidance:

> The "classic role" of amicus curiae is "assisting in a case of general public interest, supplementing the efforts of counsel, and drawing the court's attention to law that escaped consideration." "The touchstone is whether the *amicus* is 'helpful' and there is no rule that '*amici* must be totally disinterested.'"

*Good George Ltd. Liab. Co. v. Cincinnati Ins. Co.*, No. 3:20-cv-01705-AC, 2021 U.S. Dist. LEXIS 220100, at *2-3 (D. Or. Nov. 15, 2021) (internal citations and quotations omitted). Amicus's attached brief meets these standards.

Finally, although the local rules do not provide any guidance as to the length of an acceptable amicus curiae brief, we have used both the Federal Rules of Appellate Procedure (Fed. R. App. P. 29 (a) (5), 29 (a) (6), and 32 (a) (7) (B)) and LR 7-2 (b) (2) for reference and have, accordingly, limited our brief to fewer than seventeen and a half pages and fewer than 5,500 words and submitted it within seven days following the principal brief for which it provides support.

For all these reasons, the amicus requests that the Court grant this motion and accept the attached amicus curiae brief for filing.

## **STATEMENT OF INTEREST OF THE AMICUS CURIAE**

Amicus curiae Public Health Advocacy Institute ("PHAI") is a nonprofit organization incorporated in Massachusetts in 1979 and headquartered in Boston. PHAI is a legal research and advocacy center focused on public health law.  PHAI's goal is to support and enhance a commitment to public health in those that shape public policy through law.

The present case is of concern to PHAI because it raises the question of what standards will be applied to an ever-more important segment of our cultural and economic lives, namely that of online platforms and social media. This question has broad and far-reaching implications for the safety and psychological well-being of youth throughout the country.

The negative impact on the mental health, and often physical health, caused by social networking platforms like Omegle[1] (Amicus uses "Omegle" to refer to the online platform, and

---

[1] Omegle is regarded as a social media or social networking site. *What is Omegle? what parents need to know*, Internet Matters, https://www.internetmatters.org/hub/news-blogs/what-is-omegle-what-parents-need-to-know/ (last visited Sep 14, 2022).

"Defendant" to refer to the company) has come under considerable scrutiny in recent years. A living document summarizing the research on this topic is available online. *See* Haidt and Twenge, *Social Media and Mental Health*, at 150 (online at https://docs.google.com/document/d/1w-HOfseF2wF9YIpXwUUtP65-olnkPyWcgF5BiAtBEy0/edit#) (accessed Sep. 14, 2022). There is a growing academic consensus supporting the concerns voiced by parents of children across the country that platforms like Omegle have the potential and do cause serious psychological harms, and in the most extreme cases, result in outcomes like what occurred to the plaintiff in this case.

PHAI has done research and advocacy on issues involving public health, including issues that affect psychological or behavioral health, including gambling and social media platforms, as well as issues that impact youth, including the youth marketing of cigarettes, e-cigarettes, and obesogenic foods. The Amicus Curiae is therefore well-prepared to provide the court with insight here.

September 19, 2022                     Respectfully submitted,

                                       COUNSEL FOR AMICUS CURIAE,
                                       PUBLIC HEALTH ADVOCACY INSTITUTE

                                       __*/s/ Paul T. Lyons /s/*_____
                                       Paul T. Lyons (#707430)
                                       Andrew Rainer (#542067)
                                       Meredith K. Lever (#691953)
                                       Public Health Advocacy Institute
                                       360 Huntington Ave #117CU
                                       Boston, MA 02115
                                       (617) 313-9016
                                       p.lyons@phaionline.org
                                       arainer@phaionline.org
                                       meredith@phaionline.org

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

| | |
|---|---|
| A.M., an individual,<br><br>Plaintiff,<br><br>v.<br><br>OMEGLE.COM LLC,<br><br>Defendant. | Case No. 3:21-cv-01674-MO |

**BRIEF OF AMICUS CURIAE PUBLIC HEALTH ADVOCACY INSTITUTE IN SUPPORT OF PLAINTIFFS' SECOND AMENDED COMPLAINT**

The Court is asked to determine whether Omegle should be considered a product and therefore subject to strict liability for defects. In answering this question, the Court should recognize that Omegle shares the essential characteristics of a product that have long been recognized under products liability law, namely that Omegle is placed into the stream of commerce for use by the public and that this placement is done *en masse* and without the customization for individual users that would be definitive of a service in this context. Moreover, the Court should also recognize that product is a flexible term that has developed over time to remain consistent with the underlying policy rationale that gave rise to products liability law in the first place. Lastly, claims that challenge Omegle's design choices should be recognized as distinct from the expression of ideas challenged in the digital media cases cited by the Defendant.

To first focus on where there is common ground between the parties, the parties agree that Omegle is a programmed technology provided for free for access by users in the general public. *See* Plaintiff's Second Amended Complaint ("SAC") at 4. The website is akin to a machine or tool which is provided by the Defendant for use by consumers to serve a particular predefined function,

1

that is to create a video or text chat with another user at random. That function is designed and enabled by the Defendant, but for so long as a user has the website open on their computer, it is controlled by the user.

As the Plaintiff points out in her Opposition to the Motion to Dismiss, the Omegle website is personal and moveable, a user can control it at their will once it is made available to them by the Defendant, and it is tangible in that it can be seen, heard, and be interacted with. Plaintiff's Response in Opposition to Motion to Dismiss Second Amended Complaint, at 14-15. In short, the website has all the distinctive characteristics of a product.

Lastly, the negligence claim brought by the Plaintiff in the SAC should be regarded as distinct from her products liability claims and not barred by section 230 of the Communications Decency Act because to do otherwise would be contrary to the clear intent of both the Oregon legislature and the United States Congress.

## TABLE OF CONTENTS

Statement of Interest of The Amicus Curiae ............................................................................... ii

Table of Contents ......................................................................................................................... 3

    I.    The Court Should Look to Both the Second and Third Restatements in Deciding Whether Omegle Fits the Definition of a Product ................................................................. 4

    II.    The Policy Rationale Underlying Products Liability Law Favors Treating Omegle as a Product Because the Company is in the Best Position to Detect and Prevent Harms and to Absorb the Costs of Injuries ................................................................................................... 6

    III.    Courts have Typically Found that Tools Provided Over the Internet, Like Omegle, are Products .................................................................................................................................. 8

    IV.    The Court Should, Consistent with Congress's Intent in Enacting Section 230 to Encourage Content Moderation, Hold that the Negligence Claim is Not Barred Under the CDA, and that, Consistent with the Second Restament and Oregon State Law, the Plaintiff's Negligence Claim is Distinct From her Products Liability Claims ...................................... 12

Conclusion ................................................................................................................................. 13

### I. THE COURT SHOULD LOOK TO BOTH THE SECOND AND THIRD RESTATEMENTS IN DECIDING WHETHER OMEGLE FITS THE DEFINITION OF A PRODUCT

Both section 402A of the Restatement (Second) of Torts ("Second Restatement") and sections nineteen and twenty of the Restatement (Third) of Torts ("Third Restatement") provide valid guidance for the Court to consult in deciding this case. However, because the Third Restatement is more recent, and therefore reflects newer case law dealing with the development of the internet and digital economy, and because the Third Restatement goes further in defining products, the Third Restatement may provide more useful guidance. That being said, the law based on either restatement on this subject is not in conflict. Both support the conclusion that a platform like Omegle is a product.

The Defendant is correct that the Second Restatement's section 402A, as adopted by the legislature of Oregon in Or. Rev. Stat. § 30.920, is the governing authority to use when construing a products liability action under Oregon law. Unfortunately, neither the Restatement nor the Oregon state statutes provide a clear definition of what constitutes a product. *See* Second Restatement § 402A; Or. Rev. Stat. § 30.900; *see also Ass'n of Unit Owners of Bridgeview Condos. v. Dunning*, 187 Or. App. 595, 615 (2003) ("The statute does not define the term. In its ordinary usage, it is capable of broad meaning.") However, section 402A does make clear that the seller must be "engaged in the business of selling such a product," and not merely making an occasional sale. *See* Second Restatement § 402A (1) (a), cmt. f.

The Third Restatement, on the other hand, goes significantly further in providing definition and guidance. Fortunately, the Oregon State Bar has expressly recognized that, where not inconsistent with section 402A and Or. Rev. Stat. § 30.920, lawyers may argue for the application of the Third Restatement as appropriate authority on products liability actions. 1 Torts (OSB) § 20.2-2 (Legal Pubs 2012). So, the Third Restatement provides proper authority for the Court to

4

supplement its understanding of product liability law.

Under the Third Restatement, products are defined as "tangible personal property distributed commercially for use or consumption." Third Restatement § 19 (a). However, as the Restatement immediately makes clear by referring to "other items" in the following sentence, that definition is not exhaustive. Rather, the critical inquiry is whether "the context of their distribution and use is sufficiently analogous to the distribution and use of tangible personal property." *Id.* The comments to the Third Restatement's section 19 expressly recognizes certain intangible products as well, including electricity[2] and the information contained in maps and navigational charts, making it clear that far more than movable physical objects may be considered products. *See id.* at cmt. d.

Putting both restatements together, the critical inquiry in determining whether a particular article is a product is whether the article in question was made and distributed with the intent to be used or consumed by the public as part of the regular business of a seller or distributor. *See* Restatement (Third) of Torts: Products Liability § 19; Restatement (Second) of Torts § 402A. Omegle shares all these characteristics in that it is made to be used by the public in the stream of commerce.[3]

---

[2] Courts addressing products liability claims brought against digital media have found them to fail for challenging intangibles when said challenge is directed at the thoughts or ideas expressed within the media. *See e.g. Sanders v. Acclaim Entertainment, Inc.*, 188 F. Supp. 2d 1264, 1281-1282 (D. Colo. 2002). The Amicus will not belabor a point already well-made in the Plaintiff's brief, but the analogy to electricity to supplied to one's home is particularly apt. Here too, a product, Omegle's website, has been provided for the public to access and to bring into their home for their own use and control.

[3] It is worth noting here, that Omegle is a commercial enterprise. Its revenues structure is triangular: Advertisers pay Omegle money, Omegle directs the advertisements at users, and users consume the advertisements.

Moreover, products liability cases generally do not require a transaction to impose products liability. *See* Restat 3d of Torts: Products Liability, § 20, Reporter's Notes. In fact, modern products liability law began with the recognition of claims brought by victims despite their lack of privity with the defective product's manufacturer. *See generally* William L. Prosser, *The Assault Upon the Citadel*, 69 YALE L. J. 1099 (1960); *see also Purdy v. Deere & Co.*, 281 Or. App. 407, 411-412 (2016) ("Although both ORS 30.920 and *Restatement* section 402A (1965) speak in terms of a product's danger to a 'user or consumer,' a nonuser or nonconsumer injured by an unreasonably dangerous defective product also is entitled to pursue a products liability claim under ORS 30.920 under. There, we held that,

## II. THE POLICY RATIONALE UNDERLYING PRODUCTS LIABILITY LAW FAVORS TREATING OMEGLE AS A PRODUCT BECAUSE THE COMPANY IS IN THE BEST POSITION TO DETECT AND PREVENT HARMS AND TO ABSORB THE COSTS OF INJURIES

As the Court is no doubt aware, the application of products liability principles to online platforms like Omegle is a relatively novel question. Therefore, it is necessary to look for further principles for a decision on this subject. In cases where the definition of a product's applicability is ambiguous, courts look to the public policies that have historically motivated the development of products liability. Products liability law is and has always been a doctrine that is meant to be responsive to changes in technology and how those changes impact our economy and society. Considering the underlying principles of products liability and the necessity of responding to the fact that more and more of our social and economic activities are now conducted over online platforms like Omegle, the Court should regard Omegle as a product.

Fortunately, the Reporter's Notes to the Third Restatement speaks to the courts consulting the policy goals of strict liability in cases where the application of the term 'product' is ambiguous:

> When the applicable definition fails to provide an unequivocal answer, decisions regarding whether a "product" is involved are reached in light of the public policies behind the imposition of strict liability in tort. Some of the policy considerations include: (1) the public interest in life and health; (2) the invitations and solicitations of the manufacturer to purchase the product; (3) the justice of imposing the loss on the manufacturer who created the risk and reaped the profit; (4) the superior ability of the commercial enterprise to distribute the risk of injury as a cost of doing business; (5) the disparity in position and bargaining power that forces the consumer to depend entirely on the manufacturer; (6) the difficulty in requiring the injured party to trace back along the channel of trade to the source of the defect in order to prove negligence; and (7) whether the product is in the stream of commerce."

---

under ORS 30.920, 'the doctrine of strict product liability extends to bystanders injured as a result of unreasonably dangerous products.'") (quoting *Osborne v. International Harvester Co.*, 69 Ore. App. 629, 639-40 (1984).

In light of the above, the Court should consider placing a website for the public to use in order to garner ad revenue to be akin to placing a product in the stream of commerce for sale.

6

Restatement (Third) of Torts: Products Liability § 19, Reporter's Notes cmt. A[4]

The Oregon Supreme Court has likewise recognized:

> The imposition of strict liability is the response to some demonstrated public need where the traditional legal theories have been found inadequate to the task. The recent expansion of the strict liability of the seller of goods came about in response to such a situation.

*Chandler v. Bunick*, 279 Or. 353, 356 (1977).[5]

Recognizing that the task of finding whether something should be considered a product or not depends on whether doing so would advance the policy goals of products liability law, the necessary next step is to define the goals themselves. The Reporter's Notes to the Third Restatement, quoted above, goes a long way in identifying these goals. Further, the Explanatory Notes to Section 402A of the Second Restatement likewise identifies three principal policies:

> The seller . . . has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect . . . that reputable sellers will stand behind their goods; and that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production . . . ; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.

Restatement (Second) of Torts § 402A cmt. c.[6]

Finally, products liability is motivated by the recognition that the manufacturer is in the best position to prevent harm from defects.[7]

---

[4] (citing *Trent v. Brasch Mfg. Co.*, 477 N.E.2d 1312, 1315 (Ill. App. Ct. 1985); *Bastian v. Wausau Homes Inc.*, 620 F.Supp. 947, 949 (N.D. Ill. 1985) (applying Illinois law); *Firkin v. United States Polychemical Corp.*, 835 F.Supp. 1048, 1051 (N.D.Ill.1993) (applying Illinois law); *Jackson v. City of Franklin*, 554 N.E.2d 932 (Ohio Ct.App.1988); *Board of Educ. v. W.R. Grace Corp.*, 609 A.2d 92, 106 (N.J. Super. Ct. Law Div.1992); *see also* PROSSER AND KEETON, THE LAW OF TORTS §§ 98, 99 (5th ed. 1988 Supp.)).

[6] *See also* William L. Prosser, *The Assault Upon the Citadel*, 69 YALE L. J. 1099, 1120 (1960) (explaining from a contemporary perspective that the development of strict liability as applied to products was motivated by three arguments which persuaded the courts. These were: 1) The law should ensure the maximal protection of human life, health, and safety; 2) The suppliers of products intrinsically represent to the public that their products are safe and suitable to use, and they should be held to that representation; and 3) The efficient disposition of liability).

[7] DAN B. DOBBS, THE LAW OF TORTS § 353, at 975-76 (2000); WILLIAM M. LANDES & RICHARD A. POSNER, THE ECONOMIC STRUCTURE OF TORT LAW 4-5 (1987).

Here, treating Omegle as a product comports with each of the above outlined policy goals. Doing so would serve the public interest in protecting life and health. It would hold Omegle to its representations and to the expectations of the public.[8] It would serve justice by having those who reaped the profits pay the true cost of the product. It would enable better distribution of the costs of injuries. It would recognize the disparity in the party's positions. It would ease the inefficiencies of tracing liability back to its ultimate source. Finally, the Defendant is certainly in the best position to detect and fix problems with their product, even more so because they retain control of the product even throughout its use.

Therefore, the Court should recognize the following two principles: first, that the definition and scope of products necessarily must adapt to the changing conditions of the economy, to continue to serve the above-outlined policy goals which have always served as fundamental principles for products liability; and second, that serving those goals demands regarding online platforms like Omegle as products.

### III. COURTS HAVE TYPICALLY FOUND THAT TOOLS PROVIDED OVER THE INTERNET, LIKE OMEGLE, ARE PRODUCTS

The Court should recognize that virtual tools provided over the internet in a uniform and mass-marketed fashion, like Omegle, are treated as products, not services. The cases cited by Defendant regarding digital media are inapposite because these cases challenged ideas and content

---

[8] It is worth noting here that Omegle should not be allowed to disclaim their responsibility for providing a platform which it knows enables sexual predators to target children simply because it acknowledges that it does so. Leaving aside the issue of whether Omegle's statements provide an adequate warning, which Amicus contends they do not, they do not reach the minds of parents who allow their children to surf the web. Those parents, and the public at large, deserve to live in a world where – at the very least – companies do not knowingly provide the means for sexual predators to prey on children. Danielle Keats Citron & Benjamin Wittes put this well when they wrote,

> In physical space, a business that arranged private rooms for strangers to meet, knowing that sexual predators were using its service to meet kids, would have to do a great deal more than warn people to proceed 'at their own peril' to avoid liability when bad things happened.

Danielle Keats Citron & Benjamin Wittes, *The Internet Will Not Break: Denying Bad Samaritans Section 230 Immunity*, 86 FORDHAM L. REV. 401, 403 (2017).

rather than the design of the product itself, whereas here the Plaintiff has brought her claims based on the choices made by the Defendant in designing the Omegle platform itself, which is independent of any expressive content. *See* SAC at 19-20**.** Consequently, the court should recognize, consistent with the general treatment of software provided over the internet, that Omegle is a product and subject to products liability.

The Ninth Circuit suggested in *Winter v. G.P. Putnam's Sons*, that products liability likely would apply to software. 938 F.2d 1033, 1035 (9th Cir. 1991). The writers of the Third Restatement likewise acknowledged the trend of critical support for the application of products liability to software. Third Restatement § 19 cmt. D. In fact, many courts forego the analysis entirely, implicitly deciding that products liability principles apply to software, including software provided for free over the internet. *See, e.g., Lemmon v. Snap, Inc.* 995 F.3d 1085 (9th Cir. 2021); *Herrick v. Grindr, L.L.C.,* 306 F. Supp. 3d *579,* 592 n.9 (S.D.N.Y. 2018), *aff'd*, 765 F. App'x *586* (2d Cir.), *cert. denied,* 140 S. Ct. 221 (2019) ("It appears to be common ground between the parties that strict products liability may apply to standardized and mass-downloaded software.")[9]

The recognition of software as products is consistent with the treatment of software in other areas. The Third Restatement acknowledges as much, referencing the treatment of software under the Uniform Commercial Code. *See* Third Restatement § 19 cmt. D ("Under the Code, software that is mass-marketed is considered a good")[10] Similarly, in tax cases, courts have found the sale

---

[9] *See also Williams v. Apple Inc.,* No. H-19-782, 2019 U.S. Dist. LEXIS 78772, at *8-11 (S.D. Tex. May 9, 2019) (accepting, implicitly, iOS 12.1 as a product for the purpose of the defective design theory but dismissing the plaintiff's claim for their failure to plead a reasonable alternative design); *Hardin v. PDX, Inc.,* 173 Cal. Rptr. 3d 397, 407 (2014) (declining to dismiss a product liability claim where the defendant argued that software was not a product); *Schafer v. State Farm Fire & Cas. Co.,* 507 F. Supp. 2d *587,* 600-01 (E.D. La. 2007).

[10] citing *Systems Design v. Kansas City Post Office*, 788 P.2d 878 (Kan. Ct. App. 1990); *Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670 (3d Cir.1991) (applying Pennsylvania law); *RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d 543 (9th Cir.1985) (applying California law)). The Restatement writers, however, acknowledge that under the UCC, software developed specifically for the customer is a service. *See, e.g.*, *Data Processing Servs., Inc. v. L.H. Smith Oil Corp.*, 492 N.E.2d 314 (Ind. Ct. App. 1986); *Micro-Managers, Inc. v. Gregory*, 434 N.W.2d 97 (Wis. Ct. App. 1988).

of software to be a taxable sale of goods. *See e.g. Citrix Sys., Inc. v. Comm'r of Revenue*, 484 Mass. 87, 94-97 (2020); *Chaves v. Amazon.com Servs. LLC*, W.D. Wash., No. C21-1213-TL-BAT (May 23, 2022). Notably, the courts in both *Citrix* and *Chavez* found that the method of delivery, e.g., by download or by compact disk was immaterial to their analysis. *Citrix*, 484 Mass. at 94 (2020); *Chaves*, No. C21-1213-TL-BAT, at *15 (May 23, 2022).[11] Finally, there has been an international trend, including in the United States, of recognizing property rights in various virtual goods.[12]

The Defendant argues that Omegle is a service rather than a product. Defendant's Motion to Dismiss Plaintiff's SAC, at 33. Courts have addressed this argument before and found it wanting. The Second Circuit in *Saloomey v. Jeppesen & Co.* found that the mass production and marketing of the items in question made them definitively products and "require[d] Jeppesen to bear the costs of accidents that are proximately caused by defects in the[m]." 707 F. 2d 671, 677 (2d Cir. 1983); *see also Wachter Mgmt. Co. v. Dexter & Chaney, Inc.*, 144 P.3d 747, 750 (2006) (applying the UCC) ("modifications and corrections to the computer programs for improving the system operation were incidental to the sale of the software because, without the purchase of the software, the services would have been unnecessary."); *Citrix*, 484 Mass. at 96-97 (applying Massachusetts tax law and holding that the human labor involved in supporting the technology was not the true object of the transaction, rather the technology itself was the true object, and the ongoing labor to support it was incidental).

---

[11] Holding otherwise would lead to absurd results where the supplier of a product over the internet could avoid liability, whether for tax or under products liability, by ensuring that their product could only be used on their website and not by download.

[12] Virtual property is considered to encompass many items, including domain names, URLs, eBooks, tickets, email accounts, social media accounts, websites, chats, bank accounts, cryptocurrencies and more. Kateryna Nekit, *Social Media Account as an Object of Virtual Property*, 14 MASARYK UNIVERSITY JOURNAL OF LAW AND TECHNOLOGY, 201–226 (2020) (discussing the development of virtual property internationally though citing U.S. sources e.g. Fairfield, Joshua Fairfeild, *Virtual Property* 85 B.U. L. REV. 1047 (2005) (Available at SSRN: https://ssrn.com/abstract=807966); *see also* Uniform Fiduciary Access to Digital Assets Act; Heather Conway & Sheena Grattan, The 'New' New Property: Dealing with Digital Assets on Death, MODERN STUDIES IN PROPERTY LAW: Volume 9, 99-115 (2017) (Available at SSRN: https://ssrn.com/abstract=3289171).

Finally, the cases cited by the Defendant to support their argument that websites are not products are not instructive in this case. The claim brought in *James v. Meow Media* had nothing to do with the design or features of the website in question, and everything to do with the expressive content found therein. 300 F.3d 683 (6th Cir. 2002). The same is true of *Intellect Art Multimedia, Inc. v. Milewski*, 24 Misc 3d 1248(A), 1248A, 899 N.Y.S.2d 60, 60 (Sup. Ct. 2009). It is true that products liability does not attach to thoughts or ideas which plaintiffs allege have caused them harm, but the Plaintiff in this case alleges that the design choices made by the Defendant in supplying Omegle as a tool for interacting with others caused her harm. The court in *Winter v. G.P. Putnam's Sons* addressed this distinction elegantly:

> A book containing Shakespeare's sonnets consists of two parts, the material and print therein, and the ideas and expression thereof. The first may be a product, but the second is not. The latter, were Shakespeare alive, would be governed by copyright laws; the laws of libel, to the extent consistent with the First Amendment; and the laws of misrepresentation, negligent misrepresentation, negligence, and mistake. These doctrines applicable to the second part are aimed at the delicate issues that arise with respect to intangibles such as ideas and expression. Products liability law is geared to the tangible world.

938 F.2d 1033, 1034 (9th Cir. 1991); *see also Wilson v. Midway Games*, 198 F. Supp. 2d 167, 173 (D. Conn. 2002) ("Courts that have addressed the proposition that this 'inciting' media speech is a 'product' for the purposes of strict liability have rejected it . . . The line drawn in these cases is whether the properties of the item that the plaintiff claimed to have caused the harm was 'tangible' or 'intangible.'") (internal citations omitted).

Here, the Omegle platform provided by the Defendant is not fundamentally different from other mass-marketed software provided for use over the internet. Omegle is designed to do very specific tasks that are not customizable by individual users. *See* SAC at 4-5. Further, because the Plaintiff challenges the design of the platform rather than any expressive content found thereon, by analogy this is the "material and print" of the Shakespeare text referred to in *Winter*, the Court

11

should find the cases the Defendant cites on digital media inapposite. In short, Omegle is a product provided over the internet for use by consumers and because plaintiff's challenge is aimed at the design choices made in creating the product, her claims are valid under established products liability law.

IV. **THE COURT SHOULD, CONSISTENT WITH CONGRESS'S INTENT IN ENACTING SECTION 230 TO ENCOURAGE CONTENT MODERATION, HOLD THAT THE NEGLIGENCE CLAIM IS NOT BARRED UNDER THE CDA, AND THAT, CONSISTENT WITH THE SECOND RESTAMENT AND OREGON STATE LAW, THE PLAINTIFF'S NEGLIGENCE CLAIM IS DISTINCT FROM HER PRODUCTS LIABILITY CLAIMS**

To briefly address the application of section 230 to the Plaintiff's new negligence claim, the Amicus wishes to draw the court's attention to the fact that the Defendant seeks protection for its failure to ensure that Omegle was safe for its users from the Good Samaritan provision of the Communications Decency Act, which Congress expressly intended to encourage internet companies to actively make their platforms safer for their users.[13] The negligence claim should also be regarded as distinct from Plaintiff's products liability claim, as is required by Oregon law and section 402A of the Second Restatement of Torts.[14]

---

[13] In enacting section 230 of the Communications Decency Act, tellingly titled "Protection for 'Good Samaritan' blocking and screening of offensive material," Congress intended to eliminate a perverse incentive that had developed where interactive computer services could best avoid liability under the Communications Decency Act by refraining from any content moderation. *See* Michael R. Bartels, *Programmed Defamation: Applying § 230*, 89 FORDHAM L. REV. 651, 656-658 (2020) (available at: https://ir.lawnet.fordham.edu/flr/vol89/iss2/9) (Explaining that Congress was reacting to two cases which had "applied traditional notions of publishing to nontraditional platforms and created a lopsided incentive to turn a blind eye to destructive activity in the process." (citing S. Rep. No. 104-230, at 194 (1996) (Conf. Rep.) ("One of the specific purposes of this section is to overrule *Stratton-Oakmont v. Prodigy* and any other similar decisions which have treated such providers and users as publishers or speakers of content that is not their own because they have restricted access to objectionable material."); 47 U.S.C. § 230 (c); S. REP. NO. 104-230, at 194 ("This section provides 'Good Samaritan' protections from civil liability for providers or users of an interactive computer service for actions to restrict or to enable restriction of access to objectionable online material."); *Stratton Oakmont v. Prodigy Services Co.*, No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) *superseded by statute*, Communications Decency Act of 1996, Pub. L. No. 104-104, § 509, 1 *recognized in Shiamili v. Real Est. Grp. of N.Y., Inc.*, 952 N.E.2d 1011 (N.Y. 2011); *Cubby, Inc. v. CompuServe*, Inc., 776 F. Supp. 135 (S.D.N.Y. 1991); Ellen P. Goodman & Ryan Whittington, German Marshall Fund, *Section 230 of the Communications Decency Act and the Future of Online Speech* 2, at 4 (2019) ( available at https://www.gmfus.org/publications/section-230-communications-decency-act-and-futureonline-speech).

[14] "The rule stated here is not exclusive, and does not preclude liability based upon the alternative ground of negligence of the seller, where such negligence can be proved." Restatement (Second) of Torts, § 402A cmt. A.

## **CONCLUSION**

Omegle is a tool designed for a simple, limited purpose, to connect its users over text or video with one another at random. The Defendant promotes Omegle for use by the public at large and their primary business and the Defendant's revenue comes from the traffic of such users. Omegle, therefore, bears the same characteristic features that have traditionally defined something as a product under products liability law. Because Omegle has these same fundamental characteristics that are well-recognized as definitive of a product, and because doing so would advance the policy goals that have traditionally motivated the development of products liability, the Court should recognize Omegle as a product in this case.

**CERTIFICATE OF COMPLIANCE**

This brief complies with the applicable word-count limitation under LR 7-2 (b) and Fed. R. App. P. 29 (a) because it contains 15 pages and 4,637 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

                    */s/ Paul T. Lyons /s/*
                    Paul T. Lyons (BBO #707430)

**CERTIFICATE OF SERVICE**

I hereby certify that on September 19, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

                    */s/ Paul T. Lyons /s/*
                    Paul T. Lyons (BBO #707430)