IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION AD
CASE NO. 50-2019-CA-004782-XXXX-MB

TERESA BROOKES,
    Plaintiff,
vs.
LYFT INC,
LYFT FLORIDA INC,
HERTZ CORPORATION, and
WILKY ILET,
    Defendants.
_____/

## ORDER DENYING DEFENDANT LYFT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF'S PRODUCT LIABILTIY CLAIMS (COUNTS VI-VIII)

THIS CAUSE came before the Court for hearing on Defendant Lyft Inc. d/b/a Lyft Florida, Inc.'s (hereinafter referred to as "Lyft" or "Defendant Lyft") Motion for Partial Summary Judgment as to Plaintiff's product liability claims (Counts VI-VIII). This Court has reviewed the Motion, the Response, the Reply, and all the supplemental memoranda and material submitted by counsel. The Court also heard oral argument from counsel. Upon careful consideration of all the submissions and arguments presented, the Court finds as follows:

1. Plaintiff Teresa Brookes ("Plaintiff") was struck by a vehicle that was driven by Defendant Wilky Ilet ("Defendant Ilet") while he was a Lyft driver operating a rental vehicle through the Lyft Express Drive Program. The vehicle driven by Defendant Ilet utilized a Lyft digital application network. The application network was designed by Lyft.

2. Defendant Lyft seeks dismissal of Counts VI-VIII of Plaintiff's cause of action. This Court has previously denied Defendant's Motion for Partial Summary Judgment as to proximate causation. (See Court Docket Entry No. 385). This Court found that there was sufficient evidence in the summary judgment record for a jury to conclude whether the Lyft application distracted Defendant Ilet and thereby caused the accident resulting in injury to Plaintiff.

3. Defendant Lyft maintains in this instant motion for summary judgment that the Lyft application is not a "product" that Lyft sold to consumers and that this is a threshold prerequisite

for a product liability claim. Lyft argues that its application is a "service".

  4. Defendant Lyft is the designer, provider, and the sole distributor of the Lyft application. Lyft distributes the application into the stream of commerce. Lyft profits from the distribution of its application into the marketplace.

  5. This type of ride sharing software application network has been described as "a multi-faceted product of new technology". *See McGillis v. Department of Economic Opportunity*, 210 So. 3d 220, 223, (Fla. 3rd DCA 2017). While *McGillis* addressed whether a driver who performed transportation services with Uber's software application network was an "employee" and not whether the application was a "product" under product liability law, there was a recognition "regarding the changes rippling through our society as a result of the technology at issue". The appellate court in *McGillis* had to decide, albeit in a different context, "whether a multi-faceted product of new technology should be fixed into either the old square hole or the old round hole of existing legal categories, when neither is a perfect fit". *Id*.

  6. The Lyft application is a technology platform that connects drivers with paying customers seeking transportation services. Defendant Ilet had access to the Lyft technology known as the Lyft application through Lyft's express drive program. Count VIII of Plaintiff's action is a strict liability claim wherein she claims that the Lyft application was unreasonably dangerous because, as designed, it required Defendant Ilet to take his eyes off the road in order to search for Lyft passengers, and to respond to requests delivered from the Lyft application. The essence of a strict liability action is that a manufacturer is liable only when its product is used as intended. The focus is on the product itself. Counts VI and VII set forth direct negligence claims predicated on the claim that the application as negligently designed by Lyft and that the negligent design in conjunction with Lyft's business practices caused Defendant Ilet to be distracted while driving thereby causing the accident involving the Plaintiff. Plaintiff maintains that the Lyft application itself is defective because of the way it habituates and distracts Lyft drivers to constantly monitor the application.

  7. The question of whether the Lyft application is a product or a service for purposes of product liability law, is purely a legal question. There is no Florida precedent that has directly

addressed this question. A review of the case law in other jurisdictions is sparse and is inconclusive as it relates to whether the Lyft application is deemed a product or service under Florida product lability law.

8. A review of Florida case law leads this Court to the conclusion that the Lyft application at issue in this instant case, is a product for purposes of Florida product liability law. It is undisputed that Lyft is the designer of the Lyft application and placed the application into the marketplace. The Florida Supreme Court in *West v. Caterpillar Tractor Co.*, 336 So. 2d 80, 86-87 (Fla. 1976) held that "strict liability should be imposed only when a product the manufacturer places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being". In setting forth the public policy rationale for the imposition of strict liability, the Florida Supreme Court in *West* found that "the cost of injuries or damages, either to persons or property, resulting from defective products should be borne by the makers of the products who put them into the channels of trade, rather than by the injured or damaged persons who are ordinarily powerless to protect themselves". *Id.* at 92.

9. The doctrine of strict product liability set forth in *West* has also been applied to commercial lessors who were in the business of leasing a sailboat, the alleged defective product. The Florida Supreme Court held that those entities within the distributive chain of a product who profit from the distribution of the product were deemed to be "in a better position to ensure the safety of the products they market, to insure against defects in these products, and to spread the cost of any injuries resulting from a defect". *See Samuel Friedland Family Enter. v. Amoroso*, 630 So. 2d 1067, 1068, 1070-1071 (Fla. 1994).

10. The Florida Supreme Court has also found that the "public policy which protects the user and the consumer of a manufactured article should also protect the innocent bystander". The Court in *West* held that a manufacturer may be held liable under the theory of strict liability for injury to a bystander. *West*, 336 So. 2d at 89. "This doctrine of strict liability applies when harm befalls a foreseeable bystander who comes within range of the danger". *Id.* at 92. This duty is also applied to bystanders in negligence based on product liability claims. *See Moffat v. U.S. Foundry & Mftg Corp.*, 551 So. 2d 592, 593 (Fla. 2nd DCA 1989).

11. The Plaintiff in this case maintains she was an innocent bystander while Defendant Ilet

was driving a vehicle that utilized the Lyft application. Lyft designed the application and distributed the application to be utilized in rental vehicles such as the one driven by Defendant Ilet through the Lyft Express Drive Program.

12. Lyft is the designer and sole distributor of the Lyft application. Lyft made the design choices for the application and established the mass marketing and distribution of its application. Lyft cannot credibly argue that it is insulated from product liability claims of negligence and defective design because it uses its own product-the Lyft application-to provide a service.

13. Lyft's reliance on a number of Florida cases to depict its application as a service and not a product, is misplaced. In *Porter v. Rosenberg*, 650 So. 2d 79 (Fla. 4th DCA 1995), the plaintiff brought a product liability claim against a physician/plastic surgeon who implanted a breast implant. The physician/ plastic surgeon who supplied the product (breast implant) to the patient /plaintiff was not the designer or distributor of the product. The physician performed a medical service by placement of the implant in the patient by exercising medical judgment. The provision of the product in *Rosenberg* was "integrally related to the professional services and skill offered by the medical care provider". *Id*. at 82. The use of the product in that case "was incidental to the provision of medical services". *Id*. The 4th DCA in *Rosenberg* found that distributing products was not part of the medical care provider's business. *Id*. at 83. The physician in *Rosenberg* did not design, produce or distribute the product. The medical care provider under these circumstances was not in a position to deter the distribution and production of the defective implant. *Id*. at 82. It was in this context that the 4th DCA held that a strict liability action was inapplicable against the plastic surgeon.

14. In this instant case, Lyft's connection to the application is not simply the use of it to provide a service. Lyft is the designer and distributor of the application. Lyft's role is not akin to a doctor exercising his/her professional medical judgment and expertise in selecting the appropriate implant and the surgery inserting the implant to the patient. Lyft should be responsible for any harm caused by its digital application in the same way the designer of any defective physical product is held accountable. The Plaintiff's claims in this case arise from the alleged defective design choices and the negligent design in conjunction with Lyft's business practices.

Lyft was in the best position to control the risk of harm associated with its digital application.

15. As set forth by the Florida Supreme Court in *West* and its progeny, product liability shifts the burden to ensure a safe, non-defective product on the party who is most able to protect against the harm and bear the cost. *See Aubin v. Union Cartoid Corp*. 177 So. 3d 489, 502-503 (Fla. 2015). The principles set forth in *West* have been "applied for almost four decades to cases involving a variety of products and contexts." *Id*. at 503. There is no generally accepted definition of "product" that prevails in the reported cases. The definition of "product" should be fluid to accommodate developments in technology and is not susceptible to a "crabbed" definition. Decisions regarding what constitutes a "product" are reached in light of public policy behind the imposition of strict product liability.

16. Lyft designed and distributed the Lyft application into the stream of commerce. Lyft derives revenue and profit from distribution and the use of the Lyft application. In fact, Lyft has maintained in another case that the commissions it receives from payment by Lyft riders constitutes a trade secret. In *Cotter v. Lyft*, 2016 WL 3654454 (ND Cal. June 23, 2016), the Federal District Court held that "the total amount of commissions Lyft took from Prime Time payments, i.e. its revenue from this product, is not a trade secret". In addressing a similar case involving Uber's records as to the sum of money paid by Uber to Broward County as a usage fee, the Fourth District Court of Appeals noted that the Federal District Court in *Cotter* "found that Lyft's commissions and revenue from certain products were not trade secrets". *See Raiser-DC LLC v. B&L Serv., Inc.*, 237 So. 3d 374, 376 (Fla. 4th DCA 2018).

17. The Lyft application in this particular case is a "product" for purposes of Florida product liability law. This is consistent with the Florida Supreme Court precedent in *West* and its progeny. The cases cited by Defendant from appellate courts in Florida are all distinguishable, as Lyft is the designer and distributor of the Lyft application utilized in the vehicle driven by Defendant Ilet. Lyft's business model is a transportation network company in which it connects riders with drivers. However, the Lyft application is designed and distributed by Lyft to carry out that business model. Lyft also generates revenue and profits from the application that it designs and distributes. Lyft was responsible for placing the Lyft application in the stream of commerce

and had the ability to control any risk or harm the design of the Lyft application might cause once put into the stream of commerce. These factors are relevant in determining whether a strict liability claim can be brought against Lyft. *See e.g. Rivera v. Baby Trend, Inc.,* 914 So. 2d 1102, 1104-1105 (Fla. 4th DCA 2005).

18. Case law cited by Lyft from outside this jurisdiction does not change this Court's analysis. None of the California Superior Court cases cited by Lyft apply or address Florida case law in product liability claims. Neither of the two cases cited by Lyft are persuasive or provide meaningful direction to this Court as to the core issue of whether the Lyft application designed and distributed by Lyft in the rental vehicle driven by Defendant Ilet that generated Lyft revenue, constitutes a product. These cases did not address or mention Lyft's role as a designer and distributor of the Lyft application. These cases did not address or mention Lyft's generation of revenue as a result of its distribution of the Lyft application. The California state court trial judge did acknowledge that it did not find any legal authority determining whether the Uber application is a product or not.

19. Lyft also cites to a Federal District Court case in the State of Washington: *Quinteros v. Innogames*, 2022 WL 898560 at page 7 (W.D. Wash. March 28, 2022). That case involved whether "Forge of Empires" and other online games are a "product" under Washington's product liability law. The Federal District Court recognized that the term "product" is defined under Washington's product liability statute. The court held, applying the statutory definition, that "Forge of Empires" is "software as a service, not an object", and therefore, the product liability law claims fails as a matter of law. Florida has no such statutory definition of "product". Further, one of the cases cited and relied upon in *Quinteros* is a Federal District Court decision in *James v. Meow Media Inc*., 90 F. Supp. 2d 798, 811 (W.D. Ky. 2000) In *James*, the district court held that video games were not "products" under product liability law and focused on "whether thoughts, ideas, and messages contained in a movie, video game, or website material constitute a product for purposes of strict product liability law". *Id*. at 809-810. The Court in *James* held only "that intangible thoughts, ideas, and expressive content are not "products" under strict product liability doctrine. *Id*. at 811. The Court in *James* distinguished between the physical or

tangible properties of website materials, and the intangible properties - i.e. the intangible thoughts, ideas, and messages contained with video games and websites. Product liability law is not geared toward intangible thoughts, expressions, messages or ideas, whereas the tangible properties of websites can be subject to product liability law. *Id*. at 810-811.

20. The line drawn was whether the properties of the website or software application that caused the harm to a plaintiff were "tangible" or "intangible". In *Quinteros* and *James*, it was not the design of the video game or website that caused the alleged harm, it was the thoughts, expressions, and ideas contained within the video games or website that caused the harm. The distinction between tangible and intangible properties is also covered in the *Restatement (Third) of Torts Section 19(1998)* comment d to Section 19(a). The comments section for Section 19 of the *Restatement (Third)* notes that courts have appropriately refused to impose strict product liability in cases where the plaintiff's grievances were "with the information, not with the tangible medium". However, the tangible medium itself which delivers the information is "clearly a product". *Id*. at comment d. The Reporter's notes comments also reflect that "computer software might be considered a product for purposes of strict liability in tort." *Id*. at Reporter's Notes, comment d.

21. Plaintiff's claim in this instant case is not based on expressions or ideas transmitted by the Lyft application. It is based on the design of the application itself that was designed and distributed by Lyft into the stream of commerce. Plaintiff's product liability claim is based on defects in Lyft's mass produced technically designed application. The Plaintiff presented admissible evidence that Lyft made design choices when it decided how, when and with what frequency the Lyft application requires of the driver's attention. Lyft was in the best position to protect against any alleged risk of harm caused by those design choices. Plaintiff's product liability claim arises from the defect in Lyft's application, not from the idea or expressions in the Lyft application.

22. The Florida Supreme Court has made clear that the policy for imposing strict products liability on the designer or manufacturer of a product is to protect the user and innocent bystanders from unreasonably dangerous products or products fraught with unexpected dangers.

*West v. Caterpillar Tractor Co*., 336 So. 2d 86-87. If Lyft had designed commercial laundry machines and mass distributed them to laundromats operated by third-parties to provide a laundry service, Lyft could not credibly argue that the laundry machine was a service and not a product under a product liability claim for a design defect with the laundry machine. There is no rational basis to distinguish this Lyft application just because it involves enhanced technology from a laundry machine or any tangible object designed and distributed by an entity that causes harm due to a defective design. In both cases, the designer of the hypothetical Lyft laundry machine and the Lyft application placed into the stream of commerce to derive a profit, is in the best position to protect the user and innocent bystander against the risk of harm associated with any design defect.

23. The *Restatement (Third)* of Torts explanation on the distinction between a "product" and "service" under product liability law, is also instructive. In the Reporter's notes to comment (f), the Restatement notes set forth that strict liability does not extend to professionally provided services such as medical or legal assistance. It also does not apply to individuals who install or repair things. *Id*. at Reporter's notes, comment f. Each of these service providers provide an individualized service for customers, and have not designed, or marketed the product. Unlike these services, Lyft's application is designed, distributed, and mass marketed by Lyft.

24. The Lyft application is a product under Florida law for purpose of Plaintiff's product liability claims in this case. Lyft's reliance on the Transportation Network Companies (TNC) statute, Sec*tion 627.748, Fla. Stat*. is misplaced as it relates to its argument that its application is not a product. The TNC statute does not make any mention of product liability claims. There is no indication whatsoever in the statutory text of any intent to insulate Lyft or any other transportation network company from product liability claims associated with the design of its application. While the TNC statute does define a digital network as any "online technology application service, website or system", this does not make a digital application a service and not a product for purposes of product liability law. Lyft's argument runs contrary to clear statutory text of the TNC statute.

25. The TNC statute cannot possibly be read as an approval of the design of Lyft's

application. There is no provision in the TNC statute that sets forth that Lyft's application is safe and free from defects. The TNC statute expressly addresses a broad range of topics that relate to transportation network companies. The statute covers TNC drivers insurance requirements, TNC insurance requirements, fare transparency, insurance disclosure and exclusions, digital advertising devices, zero tolerance for alcohol or drug abuse, driver eligibility, nondiscrimination policies, requirements for determining whether a TNC driver is an independent contractor, retention of records and preemption of county and municipal laws. There is no mention of "product liability" in the statute. When a statute like this one is detailed and precise, the statutory text's plain meaning cannot logically be read to impose a prohibition on product liability claims. The statutory text and structure of the TNC statute is clear and precise. Product liability claims are not preempted against TNC companies like Lyft due to an alleged defect in the Lyft application. When a statute lists the areas to which it applies, it will be construed as excluding from its reach any areas not expressly listed. *Brown v. State*, 263 So. 3d 48, 51 (Fla. 4th DCA 2018).

26. It is also a clear rule of statutory construction that "a statute will not displace the common law unless the legislature expressly indicates an intention to do so". *Kitchen v. K-Mart Corp.*, 697 So. 2d 1200, 1207 (Fla. 1997). The Legislature did not express an intention to displace the common law of product liability in the TNC statute or to define the nature of a TNC application for purposes of product liability law.

27. Lyft also contends that the 2020 Amendment to the TNC statutes bars Plaintiff's product liability claims. The 2020 Amendment became effective on June 23, 2020, after the date of the accident in this case and after Plaintiff filed this lawsuit. There is nothing within the statutory text of the 2020 Amendment that suggests the Legislature intended that it apply to claims brought before the 2020 Amendment.

28. Absent clear legislative intent, a law affecting substantive rights is presumed to apply prospectively. Se*e Alamo Rent-A-Car v. Mancusi*, 632 So. 2d 1352, 1358 (Fla. 1994). Substantive law "prescribes duties and rights and procedural law concerns the means and methods to apply and enforce these rights and duties". *Id*. An application of the principles makes it clear that the

2020 Amendment to the TNC statute affects substantive rights, liabilities and duties, and cannot be applied retroactively. *See Arrow Air Inc. v. Walsh,* 645 So. 2d 422, 425 (Fla. 1994).

29. The 2020 Amendment is also not applicable to Plaintiff's claims against Lyft in Counts VI-VIII as these counts are not vicarious liability claims. The 2020 Amendment concerns claims against TNC's for vicarious liability "by reason of owning, operating, or maintaining the digital network accessed by a TNC driver or rider". *Section 627.748(18) Fla. Stat.* (2020). The 2020 Amendment is titled "Vicarious Liability". *Id*. The statute also specifically provides that this subsection "does not alter or reduce... the liability of any person other than the vicarious liability of a TNC as described in subsection (a)". *Id*. at subsection (b). The statutory text is clear that the 2020 Amendment applies to vicarious liability claims. A vicariously liable party engages in no wrongful conduct. *See Grobman v. Posey*, 863 So. 2d 1230, 1236 (Fla. 4th DCA 2003) *cited in Mainstreet Entertainment, Inc. v. Faircloth*, 342 So. 3d 232, 236 (1st DCA 2022). Plaintiff's claim in Counts VI-VIII that Lyft is liable for its conduct in the defective design of its application and its negligent conduct with respect to the design of the application and its business practices.

30. Lyft also maintains that there is no summary judgment evidence that the Lyft application is defective or unreasonably dangerous. Upon review of the summary judgment record, this Court disagrees with Lyft's position. There is sufficient evidence presented for a jury to conclude whether the Lyft application distracted Defendant Ilet and thereby caused the accident resulting in injury to Plaintiff. This Court has already found that the testimony of Dr. Mary Cummings is admissible and not speculative or conjecture. The Court incorporates by reference the findings made by the Court as to Dr. Cummings' testimony in its Order Denying Plaintiff's Motion for Partial Summary Judgment as to Plaintiff's product liability claims entered on February 24, 2022 (See Court Docket Entry No. 385-paragraphs 10-14 and 17-19 of the Order Denying Partial Summary Judgment).

31. The record evidence can support a conclusion that the Lyft application was defectively designed and unreasonably dangerous. There is also sufficient evidence at summary judgment to allow a reasonable fact finder to conclude that Defendant Ilet monitored the Lyft application as Lyft intended the application to be used. Plaintiff presented admissible evidence that Lyft

designed the application so that it can be monitored while driving without restriction. There is admissible evidence that Lyft's design of the Lyft application caused Defendant Ilet to be distracted at the time of the accident, thereby causing injury to a bystander-in this case, the Plaintiff.

32. Lyft also maintains that it owed no legal duty to Plaintiff as it relates to the negligence based products liability claims. Lyft's position is incorrect. The Florida Supreme Court has held that the legal duty element focuses on whether the defendant's conduct foreseeably created a "broader zone of risk" that poses a general threat of harm to others. *McCain v. Florida Power Corp.,* 593 So. 2d 500, 502- 503 (Fa. 1993). A defendant whose conduct creates a foreseeable zone of risk has a duty to "either lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses". A "legal duty will arise whenever a human endeavor creates a generalized and foreseeable risk of harming others". *Id.* at 503. The legal duty requirement "is a minimal threshold legal requirement for opening the courtroom doors." *Id.* at 502. The "trial and appellate courts cannot find a lack of duty if a foreseeable zone of risk more likely than not was created by the defendant". *Id.* at 503.

33. A legal duty does require more than foreseeability alone. A duty requires that a party be in a position to "control the risk". *Surloff v. Regions Bank*, 179 So.3d 472, 475 (Fla. 4th DCA 2015). It was reasonably foreseeable that a pedestrian bystander could be injured by a vehicle driven by a driver using the Lyft application. Plaintiff has presented admissible evidence from Dr. Cummings that the Lyft application is defective because of its tendency to distract drivers from focusing on the road and pedestrians. There is record evidence that the Lyft application required Defendant Ilet to make a decision within 15 seconds whether to accept a ride request. Lyft also provided Defendant Ilet incentive to monitor and frequently scan the Lyft application for ride requests and notifications.

34. There is record evidence that Lyft built into the design of its application functions and features that incentivized and habituated drivers to focus and maintain attention to the Lyft application. It was reasonably foreseeable that a pedestrian could be injured by a vehicle driven by a driver distracted by the Lyft application. There is record summary judgment evidence

presented that Lyft designed its application and its business model in a manner that promoted distracted driving. Lyft was, as the designer of the application, in a position to control any risk of harm to bystanders-pedestrians such as the Plaintiff. Lyft therefore had a legal duty to Plaintiff.

For all the reasons set forth above, it is hereby

ORDERED and ADJUDGED that Defendant Lyft's Motion for Partial Summary Judgment as to Plaintiff's Product Liability Claims-Counts VI-VIII is DENIED. As all dispositive motions have now been ruled upon and all discovery has been concluded, lead trial counsel for the parties shall prepare a Joint Trial Report by October 7, 2022 as to any motions *in limine* that need to be addressed and potential trial dates. Upon receipt of the Joint Trial Report, the Court will convene a Joint Pretrial Conference.

**DONE AND ORDERED** in Chambers, at West Palm Beach, Palm Beach County, Florida.

50-2019-CA-004782-XXXX-MB   09/30/2022
Jaimie R. Goodman   Circuit Judge

50-2019-CA-004782-XXXX-MB   09/30/2022
Jaimie R. Goodman
Circuit Judge

**COPIES TO:**

| | | |
|---|---|---|
| GLEN R. GOLDSMITH, ESQ | 9500 S DADELAND BLVD SUITE 601 MIAMI, FL 33156 | ggoldsmith@goldsmithpa.com lchacon@goldsmithpa.com |
| JANE KREUSLER-WALSH | 501 S FLAGLER DR SUITE 503 WEST PALM BEACH, FL 33401 | JANEWALSH@KWVSAPPEALS.COM eservice@kwvsappeals.com kwcvpa@gmail.com eservice@kwcvpa.com |
| JEANMARIE WHALEN | 2401 PGA BLVD STE 140 PALM BEACH GARDENS, FL 33410 | ESERVICE@DCWLAW.COM jw@dcwlaw.com rrg@dcwlaw.com msaunders@slawsonlaw.com |
| JENS C. RUIZ | 80 SOUTHWEST 8TH STREET MIAMI, FL 33130 | JRUIZ@RUMBERGER.COM jruizsecy@rumberger.com docketingmiami@rumberger.com |

| | | |
|---|---|---|
| MATTHEW THOMAS CHRIST | No Address Available | MTC@dcwlaw.com<br>EService@dcwlaw.com |
| REBECCA VARGAS | No Address Available | rvargas@kwvsappeals.com<br>eservice@kwvsappeals.com |
| SCOTT M. SARASON | 80 SW 8TH ST<br>SUITE 3000 BRICKELL BAYVIEW CENTRE<br>MIAMI, FL 33130 | SSARASON@RUMBERGER.COM<br>docketingmiami@rumberger.com<br>ssarasonsecy@rumberger.com |
| SCOTT M. SARASON | No Address Available | ssarason@rumberger.com<br>ssarasonsecy@rumberger.com |
| MARK BIDEAU | 777 SOUTH FLAGLER DRIVE<br>SUITE 300 EAST<br>WEST PALM BEACH, FL 33416-0629 | bideau@gtlaw.com<br>FLService@gtlaw.com<br>thomasd@gtlaw.com |